United States District Court
Southern District of Texas
**ENTERED**
August 17, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SYSCO CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-18-3439 |
| | § | |
| FRANK SCHMIDT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending and referred to the undersigned is Plaintiff's Motion for Summary Judgment (Document No. 24) and Defendant's Motion for Summary Judgment (Document No. 29). Having considered the cross motions for summary judgment, the responses and additional briefing, the summary judgment evidence, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment be GRANTED in PART and that Defendant's Motion for Summary Judgment be DENIED.

## I.     Background

This is a breach of contract case brought by Plaintiff Sysco Corporation ("Sysco") against Frank Schmidt ("Schmidt"), the former Chief Financial Officer of Sysco-Lincoln, Inc., one of Sysco's operating companies. Sysco alleges in its Complaint that despite Schmidt signing a Restrictive Stock Unit Agreement in both 2016 and 2017 and obtaining the stock provided for thereunder, he resigned in August 2018 and went to work for one of Sysco's direct competitors, Cash-Wa, in a position that was the same or nearly identical to that from which he was resigning. Sysco promptly brought suit, and sought injunctive relief. Before the request for injunctive relief

could be considered, Schmidt was reassigned by Cash-Wa to a general manager position. Despite that reassignment, Sysco maintains in its Motion for Summary Judgment that Schmidt breached the 2016 and 2017 "Protective Covenants Agreements," which were incorporated into the 2016 and 2017 Restricted Stock Units Award Agreements by going to work for Cash-Wa as Cash-Wa's CFO, and that it is entitled, pursuant to the terms of both the 2016 and 2017 Restricted Stock Units Award Agreements to the return of 489 shares of stock that were provided to Schmidt, 337 of which vested pursuant to the 2016 Restricted Stock Units Award Agreement, and 152 of which vested pursuant to the 2017 Restricted Stock Units Award Agreement. Schmidt, in response to Sysco's Motion for Summary Judgment and in his own cross Motion for Summary Judgment, argues that the terms of the Protective Covenant Agreements are too broad and are unenforceable insofar as they restrict his ability to work for Cash-Wa; that it there is no evidence that he breached the non-disclosure and non-solicitation provisions of the Protective Covenant Agreements, and that Sysco has no evidence of any damage(s). The Motions for Summary Judgment are both fully briefed and are ripe for ruling.

## II.    Summary Judgment Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating that there exists no genuine issue of material fact. *Brandon v. Sage Corp.*, 808 F.3d 266, 269—70 (5th Cir. 2015) (citing *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986)). Once the moving party meets its burden, the burden shifts to the nonmovant, "who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists" and that summary judgment should not be

granted. *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).[1] A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *Celotex*, 106 S. Ct. at 2548. Instead, the non-movant "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment." *Brandon*, 808 F.3d at 270 (quoting *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006)).

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are to be viewed in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). "If the record, viewed in the light most favorable to non-movant, could not lead a rational trier of fact to decide in non-movant's favor, summary judgment is appropriate." *Allen v. Radio One of Texas II, LLC*, 515 Fed. Appx 295, 299 (5th Cir. 2013) (citing *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Kelley*, 992 F.2d at 1413. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2513 (1986).

---

[1] Where "the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transp. A/S v. Int'l Marin Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

## III.    Discussion

The sole claim asserted by Sysco is for breach of contract, with the contracts at issue being the 2016 and 2017 Restricted Stock Units Award Agreements, which incorporated the corresponding 2016 and 2017 Protective Covenant Agreements. Those agreements are similar, but not identical. The terms of the 2016 Restricted Stock Units Award Agreement provided, in relevant part:

> 5.    Post-Employment Covenants: Additional Remedies of Clawback and Recoupment
>
> (a) Notwithstanding any other term of the Agreement or any prior agreement to the contrary, in order to be eligible to vest in any portion of the Award, Grantee must have entered into an agreement containing restrictive covenants concerning limitations of Grantee's behavior following termination of employment that is satisfactory to the Company or one of its Subsidiaries.  Grantee further agrees that to the extent permitted by law, upon demand by the Company or one of its Subsidiaries to forfeit, return or repay the "Benefits and Proceeds" (as defined below) in the event Grantee breaches any post-employment covenant with the Company and/or any of its Subsidiaries.
>
> (b) For purposes of this Agreement, "Benefits and Proceeds" means:
>
> > (i)      to the extent Grantee has received any shares of Stock in satisfaction of the Restricted Stock Units and Grantee continues to hold those shares of Stock, the shares of the Stock so acquired;
> >
> > (ii)     to the extent Grantee has received any shares of Stock in satisfaction of the Restricted Stock Units and no longer owns the shares of Stock so acquired, cash in an amount equal to the Fair Market Value of such shares of Stock on the date such payment is demanded by the Company (which, unless otherwise determined by the Committee, shall be equal to the closing sale price during regular trading hours of the shares of Stock as reported by the New York Exchange on such date); and
> >
> > (iii)    to the extent Grantee has not received any shares of Stock in satisfaction of the Restricted Stock Units, all of Grantee's remaining rights, title or interest in the Restricted Stock Units.

(Document No. 24-7).  The corresponding 2016 Protective Covenants Agreement provided:

> "Company seeks to retain Employee in a position of special trust and confidence and award Employee certain Restricted Stock Units, and Employee wishes to accept such long term incentives; and the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and

4

its customer relationships and other good will, the parties agree as follows:"

\* \* \*

**SECTION 3. Protective Covenants.**  Employee agrees that the following covenants are, (I) ancillary to the other enforceable agreements contained in the Agreement and (ii) reasonably necessary to protect the Company's legitimate business interests.

**3.1 <u>Definitions Related to Protective Covenants</u>**

\* \* \*

(c) "Competitor" means any person or entity, or division or subsidiary of an entity, that engages in the same line of business as the Company (a line of business that involves providing a Conflicting Product or Service or service to customers or prospective customers of the Company).

(D) "Restricted Territory" means the geographic area where Employee has regularly engaged in business activities for the Company in person, by phone, or through correspondence during the Look Back Period.

\* \* \*

**3.4     Restriction on Unfair Competition.**  Employee agrees that for a period of one year following the end of Employee's employment with Company, Employee will not: accept a job that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor that are the same as, or similar in function or purpose to, those Employee performed or participated in during the Look Back Period on behalf of the Company.  This restriction is limited to assisting the in the business activities of a Competitor in the Restricted Territory.  This paragraph is not intended to prohibit (i) activities on behalf of an independently operated subsidiary, division, or unit of diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

(Document No. 24-7).

Similarly, but not identically, the terms of the 2017 Restricted Stock Units Award Agreement

provided, in relevant part, as follows:

**(8)     <u>Prohibited Activities; Post-Employment Covenants; Additional Remedies of Clawback and Recoupment</u>**

(a) Notwithstanding any other term of the Agreement or any prior agreement to the contrary, in order to be eligible to earn any portion of the Award, Grantee must have entered into an agreement containing restrictive covenants concerning limitations of the Grantee's behavior both during employment and

5

following termination of employment that is satisfactory to the Company or one of its Affiliated Companies. In the event the Grantee engages in any action that violates any such restrictive covenants at any time during the term of the Agreement, the Award shall be forfeited. The Grantee further agrees that to the extent permitted by applicable law, upon demand by the Company or one of its Affiliated Companies, Grantee will forfeit, return or repay the "Benefits and Proceeds" (as defined below) in the event Grantee breaches any post-employment covenant with the Company and/or any of its Subsidiaries.

(b) For purposes of this Agreement, "Benefits and Proceeds" means:

    (i)      to the extent Grantee has received any Stock in satisfaction of this Award and the Grantee continues to hold those shares of Stock, the shares of the Stock so acquired;

    (ii)     to the extent Grantee has received any Stock in satisfaction of this Award and no longer owns the shares of Stock so acquired, cash in an amount equal to the Fair Market Value of such shares of Stock on the date such payment is demanded by the Company (which, unless otherwise determined by the Committee, shall be equal to the closing sale price during regular trading hours of the shares of Stock as reported by the New York Exchange on such date); and

    (iii)    to the extent Grantee has not received any Stock in satisfaction of this Award, all of the Grantee's remaining rights, title or interest in the Award.

(Document No. 24-9). And, the corresponding 2017 Protective Covenants Agreement provided in relevant part:

Company seeks to promote, place, or retain Employee in a position of special trust and confidence, and Employee wishes to accept such a position; and, as a condition of such employment relationship and the benefits being provided pursuant to Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other good will, the parties agree as follows:

\* \* \*

**SECTION 3. Protective Covenants.** Employee agrees that the following covenants are, (i) ancillary to the other enforceable agreements contained in the Agreement and (ii) reasonably necessary to protect the Company's legitimate business interests.

**3.1 Definitions Related to Protective Covenants**

\* \* \*

(c) "Competitor" means any person or entity, or division or subsidiary of an entity,

that engages in the same line of business as the Company (a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of the Company).

\* \* \*

**3.4    Restriction on Unfair Competition.**  Employee agrees that for a period of one year following the end of Employee's employment with Company, Employee will not: accept a job that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Employee performed or participated in during the Look Back Period on behalf of the Company.  Assisting in the business activities of a Competitor in the Restricted Area means assisting with business within the relevant Territory (see Exhibit A) or any state within the United States where Employee has regularly engaged in business activities for the Company in person, by phone, or through correspondence during the Look Back Period if Employee's job is not limited to a specific territory.  This Paragraph is not intended to prohibit (i) activities on behalf of an independently operated subsidiary, division, or unit of diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

(Document No. 24-10).

Within the context of these two agreements, the following facts are not disputed.  Both agreements provide that Texas law applies.  Schmidt was hired as Controller of Sysco Lincoln August 2011, and was promoted to the position of Chief Financial Officer (CFO) of Sysco Lincoln in 2012.  Schmidt resigned on August 31, 2018.  In his resignation letter, Schmidt wrote:

"I have . . . been presented with an employment opportunity that will allow me to work for many more years to come and adequately prepare myself and family for a comfortable retirement.  Not only is it a CFO position with all of the responsibilities I have had with Sysco in the past, I will also get additional exposure in the areas of banking, relations, short-term and long-term investing, cash flow analysis, all areas of taxation, investor relations, acquisition targeting and fold-in's and much more."  "I have accepted this position. . . "

7

(Document No. 24-2).  Prior to his resignation, Schmidt had received 337 shares of stock pursuant to the 2016 Restricted Stock Units Award Agreement and 152 shares of stock pursuant to the 2017 Restricted Stock Units Award Agreement.  Declaration of Kim Brown (Document No. 24-1 at 9); Schmidt Deposition (Document No. 24-15 at 27).  Cash-Wa offered Schmidt the position of CFO, and Schmidt accepted that offer (sealed Document No. 25-2).  Cash-Wa is a competitor of Sysco Lincoln.  *See* Declaration of Kim Brown (Document No 24-1 at 3); Schmidt Deposition (Document No. 24-15 at 22-23.[2]  Cash-Wa reassigned Schmidt to the position of general manager of Cash-Wa's cash and carry business in September 2018, after receiving notice that Sysco intended to seek enforcement of the non-competition provision in the Restricted Stock Units Award Agreements. Schmidt Deposition (Document No. 24-15 at 45, 7, 9, 56).  This breach of contract suit was filed on September 26, 2018.

To prevail on a breach of contract claim under Texas law, a plaintiff must establish: (1) the existence of a valid contract between the plaintiff and the defendant, (2) that the plaintiff tendered performance or was excused from doing so, (3) that the defendant breached the terms of the contract, and (4) that the plaintiff sustained damages as a result of the defendant's breach. *West v. Triple B. Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A breach occurs when a party fails or refuses to do something that party has promised to do.  *Id.*

Here, Schmidt does not dispute that Sysco performed under the terms of the 2016 and 2017

---

[2] Schmidt's briefing tends to dispute that Cash-Wa was a competitor of Sysco Lincoln without directly so stating, and without referring to any summary judgment evidence from which such a conclusion could be made.  In addition, the summary judgment evidence that is in the record uniformly supports Sysco's position that Cash-Wa is a direct competitor of Sysco Lincoln, with both Kim Brown, President of Sysco Lincoln declaring as much, and Schmidt himself testifying at his deposition to that effect.  Schmidt Deposition (Document No. 24-15 at 23) (Q: ". . . would you agree that Cash-Wa distribution is one of SyscoLincoln's primary competitors? A: Yes.").

Restricted Stock Units Award Agreements by providing him, upon his execution of the agreements, with shares of Sysco stock.  What Schmidt does dispute is: (1) that the non-competition provisions in the Protective Covenants Agreement are enforceable under Texas law given the breadth of the geographic area covered by the 2017 Protective Covenants Agreement; (2) that he breached the non-solicitation and non-disclosure provisions of the Protective Covenants Agreements; and (3) that Sysco suffered any damage(s) at all.   Because Sysco's breach of contract claim is not premised on Schmidt's breach of the non-disclosure and non-solicitation provisions in the Protective Covenant Agreements, all that is at issue is the non-competition provisions (titled in the Agreements as "Restriction on Unfair Competition").

### A.      Validity and Enforceability under Texas law

Pointing to and relying on the language in section 3.4 of the 2017 Protective Covenants Agreement, Schmidt argues that the provision is overbroad and unreasonable insofar as it restricts his ability to assist in the business activities of a competitor within the relevant territory "or **any state within the United States where [he] has regularly engaged in business activities for [Sysco] in person, by phone, or through correspondence.**"   The breadth of this restriction, Schmidt argues, renders the agreement unenforceable under Texas law.  Schmidt relies, primarily, on two cases for this argument, *Evan's World Travel v. Adams*, 978 S.W.2d 225 (Tex. App.–Texarkana 1998, no pet.), and *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197 (5th Cir. 2018).

Schmidt's argument only applies to the 2017 Protective Covenants Agreement.  The language complained of, and relied upon, by Schmidt for his argument that the restriction is unenforceable under Texas law is only contained in the 2017 Protective Covenants Agreement.  That means that

Schmidt has not challenged the enforceability of the 2016 Protective Covenants Agreement.  As for the enforceability of the 2017 Protective Covenants Agreement, Schmidt's argument relies on a reading of the Restrictions on Unfair Competition provision that is much broader than the provision actually is.

In Texas, restraints on trade, including employee mobility, are generally unlawful.  But, if restrictions that limits an employee's professional mobility "contains limitations as to time, geographical area, and scope of activity to be restrained" are "reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of the [employer]," they are enforceable.  TEX. BUS. & COM. CODE § 15.50(a); *see also Marsh USA, Inc. v. Cook*, 354 S.W.2d 764, 777 (Tex. 2011) ("The hallmark of enforcement is whether or not the covenant is reasonable.").

Here, Schmidt does not challenge the longevity of the one-year restriction, nor could he given that one-year employment restrictions are generally found to be reasonable. *See Keurig Dr Pepper Inc. v. Chenier*, No. 4:19-CV-505, 2019 WL 3958154, at *10 (E.D. Tex. Aug. 22, 2019) (and Texas cases cited therein).  As for the geographic scope of the restriction – the "Restricted Area" is defined by the Agreement as "within the relevant Territory (see Exhibit A) or any state within the United States where Employee has regularly engaged in business activities for the Company in person, by phone, or through correspondence during the Look Back Period if Employee's job is not limited to a specific territory."  In the context of this case, and the summary judgment evidence, Schmidt's job as CFO of Sysco Lincoln was limited to the specific territory Sysco Lincoln served.  That territory, according to the Declaration of Kim Brown, President of Sysco Lincoln, encompasses the primary service area of "most of the state of Nebraska other than a few western counties western Iowa northern Kansas and southern South Dakota," as well as a secondary service that includes all or a

part of the states of Oklahoma, Kansas, Missouri, Colorado, Nebraska, Iowa, Wyoming, South Dakota, North Dakota, Montana, Illinois, Wisconsin, Arkansas, and Minnesota. Declaration of Kim Brown (Document No. 24-1 at 2-3). Therefore, as CFO of Sysco Lincoln, the Restricted Area for purposes of the Restriction on Unfair Competition provision in the Protective Covenants Agreement can only mean those states and areas within Sysco Lincoln's primary and secondary service area – not the entire United States as argued by Schmidt.

As for whether the Restrictions on Unfair Competition provision is too broad in the scope or type of work that is restricted, again, the restriction at issue is limited to "activities or services for a Competitor . . . that are the same as, or similar in function or purpose to, those Schmidt performed as CFO of Sysco Lincoln. This is not a case, like *D'Onofrio*, where the restriction encompassed *any* type of work for a competitor. Nor is it a case like *Evans World Travel*, in which the restriction, by language and its application, was nation-wide and industry-wide. Here is only a case in which Schmidt, who served as CFO for Sysco Lincoln, applied for, was hired by, and worked for a short period of time in September 2018, as CFO for Cash-Wa, a direct competitor of Sysco Lincoln in the geographic area where Sysco Lincoln does business and where Schmidt worked on behalf of Sysco.

In all, because the restrictions at issue in the 2016 and 2017 Protective Covenant Agreements are not overbroad, and are limited in geographic area, duration, and scope of work, the non-competition provisions at issue are reasonable, and are enforceable under Texas law. *See e.g. M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 798 (S.D. Tex. 2010) (wide geographic limitation in non-compete agreement was reasonable given the defendant's "extensive job responsibilities, his position in upper management," and the breadth of the territory his work spanned).

11

### B.      Breach of the Agreements

Schmidt also argues, generally, that he did not breach any of the provisions of the Protective Covenant Agreements, but he does not point to any specific evidence that he did not breach the Restriction on Unfair Competition provisions in those Agreements.  The uncontroverted summary judgment evidence shows that Schmidt worked as CFO for Sysco Lincoln from 2012 to the date of his resignation on August 31, 2018.  The uncontroverted summary judgment evidence also shows that Schmidt applied for, and was hired by Cash-Wa to be, the CFO of Cash-Wa, *see* offer of employment (sealed Document No. 25-2), a direct competitor of Sysco Lincoln in the area in which Sysco Lincoln did business.  While there is also summary judgment evidence that Cash-Wa's CFO, Ed Bloomington, had not retired at the time Schmidt began his employment with Cash-Wa, *see* Schmidt Deposition (Document No. 24-15 at 9), and that Cash-Wa moved Schmidt into a general manager position within the first few weeks of his employment, Schmidt Deposition (Document No. 24-15 at 4-5, 7, 9, 56); along with Schmidt notes showing he did very little before he was put in the position of general manager of Cash-Wa's cash and carry business (sealed Document No. 25-3), it is uncontroverted that Schmidt was hired by Cash-Wa as Cash-Wa's CFO, and that Schmidt, even if it was only for a short period of time, acted in that capacity.  That employment as Cash-Wa's CFO, even though it was initially short in duration, constitutes a breach of the "Restriction on Unfair Competition" provisions in the 2016 and 2017 Protective Covenant Agreements.

### C.      Damages

Schmidt's final argument is that there is no summary judgment evidence that Sysco suffered any damages from any breach of the "Restriction on Unfair Competition" provisions in the 2016 and 2017 Protective Covenant Agreements. According to Schmidt, "Sysco's breach of contract claim

cannot survive summary judgment because it has failed to provide evidence of any resulting damages for the alleged breach of contract."  Plaintiff's Motion for Summary Judgment (Document No. 29) at 10.  Sysco does not directly address this argument, and instead argues, without reference to any summary judgment evidence, that the damage it suffered was the loss of its stock – 489 shares – that Schmidt has kept despite his breach of the Restriction on Unfair Competition provisions in the Protective Covenants Agreements.

This damages issue, while scarcely briefed, provides reason for pause.  The terms of the 2016 and 2017 Restricted Stock Units Award Agreements provide that any issued stock shall be "forfeited" if the "Grantee engages in any action that violates any such restrictive covenants at any time during the term of the Agreement."  Whether that forfeiture provision is a valid and enforceable liquidated damages provision, or a penalty, has not been addressed by either side.  Moreover, there are no pleadings that would support the Court's consideration of whether the forfeiture provision could or should be considered a penalty.  Such a lack of pleading would generally end the issue, but here, where even Sysco appears to admit that Schmidt did very little for Cash-Wa as a CFO in the few days and/or weeks before he was given a general manager position, *see* Sysco's Reply (Document No. 35); and Schmidt's hand-written notes (sealed Document No. 25-3), Schmidt's argument on the lack of damages has some traction.  In particular, as previously stated, Sysco has pointed to no summary judgment evidence of any damages associated with Schmidt's breach of the Restriction on Unfair Competition provisions in the Protective Covenants Agreements, and no summary judgment evidence that Sysco sustained any damages associated with Schmidt's employment by Cash-Wa in a CFO position for a matter of a few days or weeks.  While Sysco did award Schmidt stock, that award was associated with several restrictions, several of which, including

13

the non-disclosure and non-solicitation provisions, Schmidt did not breach.  Here, where there is no summary judgment evidence of Sysco's damages, and where it cannot be ascertained whether the forfeiture provision is a proper and enforceable liquidated damages provision or an impermissible penalty, *see Atrium Medical Center, LP v. Houston Red C, LLC*, 595 S.W.3d 188 (Tex. 2020) ("When an 'unbridgeable discrepancy' exists between 'liquidated damages provisions as written and the unfortunate reality in application,' the provisions are not enforceable."), Sysco is not entitled to summary judgment on the damages aspect of its breach of contract claim.[3]

## IV.   CONCLUSION AND RECOMMENDATION

Based on the foregoing and the conclusion that the uncontroverted summary judgment evidence establishes that Defendant Schmidt breached the Restrictions on Unfair Competition provisions in the Protective Covenants Agreements, but that the issue and/or amount of damages cannot be determined on this record, the Magistrate Judge

RECOMMENDS that Plaintiff's Motion for Summary Judgment (Document No. 24) be GRANTED in PART, that Defendant's cross Motion for Summary Judgment (Document No. 29) be DENIED, and that the amount recoverable by Plaintiff as a result of Defendant's breach of

---

[3] Sysco argues that the forfeiture provision in the Restricted Stock Units Award Agreements can and should be enforced regardless of the enforceability of the non-compete provision in the Protective Covenants Agreement, and cites two cases to support that proposition, *Olander v. Compass Bank*, 363 F.3d 560, 565-568 (5th Cir. 2004) and *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 329 (Tex. 2014).  That argument does not fully take into consideration the fact that the Restricted Stock Units Awards Agreement, which contained the forfeiture provisions, required Schmidt to enter into the Protective Covenants Agreements, and the restrictions in the Protective Covenants Agreements were intertwined with both the award of the stock units, and Sysco's right to seek the forfeiture of those stock units.  In addition, neither *Olander* nor *Drennen* addressed or clearly obviated the need for a plaintiff such as Sysco to prove damages.

contract claim be left for further proceedings, including, if needed, a trial.

 The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140, 144-145 (1985); *Ware v. King*, 694 F.2d 89, 91 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

 Signed at Houston, Texas, this 17th day of August, 2020.

Frances H. Stacy
United States Magistrate Judge